MEMORANDUM OF DECISION ON THE INTERVENORS' MOTION FOR TRANSFER OF GUARDIANSHIP
On September 11, 1997, the Department of Children and Families, hereafter "DCF", filed co-terminous petitions of neglect and for the termination of the parental rights of Michael and Lorraine B. to their two children, Felicia and Joshua, who are now seven and four years old. On that date, the children were removed from their parents when their father admitted to sexually abusing Felicia and causing sexual contact between both children. Later, their mother also admitted to sexually abusing Felicia, although she claimed Michael coerced her to participate in the abuse.
In the termination petitions, DCF alleges that the parents have committed acts of omission and commission in that the children have been denied the care, guidance, or control necessary for their physical, educational, moral or emotional well being. Connecticut General Statutes § 17a-112(c)(3)(C). On March 2, 1998, the paternal grandparents, paternal aunt and uncles filed a motion to intervene, which was denied (Ward, J). On June 2, 1998, the motion was renewed and granted for the limited purpose of being heard on dispositional issues only. (Foley, J.) On July 28, 1998, Michael B., incarcerated for a term of nine years as a result of the sexual abuse the children disclosed, consented to the termination of his parental rights. His consent was found to be voluntarily and knowingly made with the advice and assistance of competent legal counsel and with an understanding of the consequences of his consent to such court action (Quinn, J). On October 22, 1998, DCF proceeded to introduce evidence concerning disposition only. On that date, the intervenors appeared with counsel.
Angela Glennie, the DCF social worker assigned to the matter from November 1997 to August, 1998, testified for the petitioner. She stated that the children were not placed together and she saw the children once or twice a month. At present, she stated, Felicia is doing reasonably well and has been in therapy. The child has recently been placed in a pre-adoptive home and instructed her "to tell the Judge she wanted to be adopted, that she felt safe now and that she wanted a `forever' family." She stated that Felicia never inquired about her parents, her CT Page 15651 grandparents, aunt or uncles.
Ms. Glennie further testified that Joshua remained in the foster home where he had initially been placed until April, 1998. At that time, DCF was also seeking a pre-adoptive home for him and sibling visits began. She stated that there were a total of four such visits. Joshua had a very hard time with the visits; he became sexually aggressive with peers and female adults. He put toys down his pants and told other children to get them. He exposed himself and had numerous problems with other children at day care. It was necessary, she stated, to move him from his pre-adoptive home and place him in a therapeutic foster home to deal with his sexualized behaviors and aggression. As a result of his deteriorating condition, sibling visits were ended and are not planned for the foreseeable future.
Ms. Glennie stated that DCF had determined not to permit any visitation with family members. The decision to deny visitation had been made prior to her involvement in the matter. She understood that because of the seriousness of the abuse, no contact was permitted awaiting the outcome of a psychological evaluation and the advice of the clinicians treating the children. Throughout the pendency of the case, the paternal grandparents periodically and regularly requested visitation. DCF stipulated to the regular and frequent requests for visitation which the paternal relatives made. They also sent cards and gifts to the children. The first set of cards and gifts were shared with the children and over time a decision was reached, based on the children's reactions, to withhold letters from the children, but all gifts were passed on. Ms. Glennie indicated the children did not ask about their relatives or about the source of the gifts. She stated that when Felicia received the first card, she stated "I do not like to read this." She appeared sad, but knew who had sent the cards. She testified that Felicia was seen by Dr. Michael Pines, a licensed clinical psychologist, who continues to treat the child. She did not know if he made any recommendations about family visitation, but she was aware that her superiors did not consider collateral family members a resource for the children.
The children's mother testified on behalf of the state as to her actions about reporting the abuse to DCF. She explained that she had called DCF once when Felicia was three years old and they were unable to confirm abuse. Lorraine indicated that there was still a pending criminal prosecution as to her about the sexual CT Page 15652 abuse matters. On the last day of the hearing, November 11, 1998, after the court's ruling on the motion of the intervenors, Lorraine B. consented to the termination of her parental rights. The court also found her consent to have been knowingly and voluntarily made with the advice and assistance of counsel and with a full understanding of the consequences of the consent on the future of her two children. The termination petitions were then amended to reflect the consent of both biological parents of Felicia and Joshua.
The paternal grandparents and aunt testified concerning their relationship with Felicia and Joshua. Their original motion was for visitation and the motion was orally amended at the hearing to request custody and/or visitation, which the court took as a request to transfer guardianship to them.[2] Until October 22, 1998, the paternal relatives had not offered themselves as a placement resource for the children, only as a visiting resource. The grandparents and aunt each indicated that prior to the removal of the children, they each enjoyed a good relationship with them. The grandmother and the aunt frequently babysat for them and had them come to the home, where they reside together, on weekends during the day. The children did not spend the night away from their parents. All three testified that none of them ever witnessed any behavior on the part of the children or the parents to suggest any sexual abuse.
Both the aunt and the grandmother testified that the children's mother, Lorraine, had spoken to them about the possibility of sexual abuse of Felicia by Michael B. Each testified that they advised her to report her concerns to the authorities. Lorraine corroborated their testimony. Curiously, neither at that time then suggested that the children could remain with them while these allegations were investigated. During the course of the pendency of the co-terminous petitions, after it became clear that DCF would not permit contact or visitation, none of the relatives sought to take any further legal steps until the original motion to intervene was filed in March, 1998, seven months after the children had been removed from their parents' home.
But most telling was the testimony of the grandmother, Alicia B. She is clearly well-meaning, well-intentioned and loves her grandchildren. She does not want to lose contact with them. However, she testified that since her oldest son, Michael, the father of the children, has been incarcerated, she sees him once CT Page 15653 a week. She has contact with him by phone and he also writes to the family sometimes. She was aware that her son had pled guilty to the charges stemming from the sexual abuse and was present in court when he did so. On cross examination, she did not recall his admission that his plea was voluntary and that he admitted to the underlying facts of the charges. She stated that she had doubts that her son sexually abused the children and does not believe that he did so. Her husband echoed her testimony. He, too, was concerned about his grandchildren. He averred that he would provide a stable environment for them and prevent communication or contact by either of the parents. But he did not believe that there was any physical or emotional abuse of his grandchildren by their father, his son, although he stated that he believed there was sexual abuse. Lisa B., the paternal aunt still living with her parents, took much the same position.
The grandparents testified that their oldest son was the most difficult of their four children. When he was an adolescent, by age sixteen he was no longer welcome in their home. Nonetheless, their heartbreaking faith in him and their denial that he could have done the things he admitted to doing to his children all indicate that they do not have the capacity to safeguard either of the two children, should guardianship be transferred to them. Their unwillingness to imagine the extent and horror of the abuse Michael and Lorraine inflicted on the children and the damaging consequences of those acts on the lives of their grandchildren is also evidenced by what they did not do. They did not volunteer to safeguard the children prior to the involvement of DCF. They have not inquired in any detail into the actual acts the parents committed against the children. They do not appear to have read in general about sexual abuse and its impact upon children. They have not consulted with any mental health or other professionals about what they should do if the children were in their care. They did not demonstrate empathy for the plight of these children and could not, from the court's observations, place the children's needs ahead of their own needs for family integrity. Their response after learning about Joshua's sexualized behavior after contact with his sister reflected their lack of such knowledge and understanding. Each stated simply that they had never seen such conduct when he was with them.
As has been noted, "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, CT Page 15654123 Conn. 88, 92, 192 A.2d 557 (1937). And the court concludes, based on the testimony, that the paternal relatives do not have any understanding about the events which took place in the home of their son, Michael. They have not grasped the very crux of the matter; that they cannot safeguard and provide care in the children's best interests while still clinging to the hope that their son did not sexually abuse their grandchildren. The court concluded that it was not in the best interests of Felicia and Joshua to be placed in the care of their paternal relatives, if indeed this was what the intervenors even wished in the final analysis.
While the court treated the motion for visitation as amended as a request for transfer of guardianship, the testimony of the paternal relatives and the arguments of counsel for custody and visitation continued to reflect their confusion about the purpose of the dispositional hearing. When disposition is being considered in a termination of parental rights cases, any visitation order would be inconsistent with the judgment being sought. The purpose of such a judgment is to vest legal authority over the children with the statutory parent or the guardians and to grant such entities or individuals the right to make decisions about the children's future life and their contact with others. As reflected in the language of Connecticut General Statutes § 46b-59, quoted by the intervenors, when parental rights or adoption are being considered by a court of competent jurisdiction, termination of visitation orders issued under that statute may also be ordered.
The intervenors also sought to challenge the propriety of DCF's determination to prohibit visitation during the pendency of the co-terminous petitions. While there might be a time and place for such a challenge, such concerns are not relevant to the dispositional phase of termination petitions, where the focus is on what is presently in the best interests of the children. "At the dispositional hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child."In re Romance M., 229 Conn. 345, 357, 641 A.2d 378
(1994). Even had there been such existing visitation, any permanent placement orders would require the end to such visitation, unless the children were placed with their relatives. Since the intervenors were granted the limited right to participate in the proceedings solely for the purpose of disposition and did not become full parties to the underlying case, the court limited the scope of the inquiry.[3] The court CT Page 15655 did not permit the questioning of DCF supervisors and other case workers concerning the DCF decision made in 1997 to deny visitation to the paternal relatives of Felicia and Joshua during the pendency of the termination petitions.
The court denied the intervenors's motion for transfer of guardianship not on the basis of their lack of contact with their grandchildren or niece and nephew during 1997 and 1998, but because it was abundantly clear that, despite their best intentions and obvious love for these children, the paternal relatives did not understand the special emotional needs of these abused children. The intervenors were visibly torn just in their own testimony between their feelings for Michael and their desire not to lose these youngest members of their extended family. How more difficult would it be for them when faced with a direct choice of whatever Michael's wishes might be and the best interests of the children? None of them appeared to understand or give credence to the possibility that Felicia's and Joshua's present best interests might require that they live apart without regular contact. None was concerned about the psychological help and assistance the children will require to mature into responsible and emotionally healthy young adults.
For all of the foregoing reasons, the intervenors' motion was denied.
Barbara M. Quinn, Judge Child Protection Session
[2] Connecticut General Statutes § 17a-112(I) contemplates in the event of termination of parental rights that either the Commissioner of the Department of Children and Families or another child placement agency will become the statutory parent of the children or that there will be a transfer of guardianship to an individual or individuals who become the guardians of the persons of the children. It does not contemplate custody of the children being awarded to third parties or visitation as in the dissolution of marriage context, Connecticut General Statutes § 46b-59, which states that any such visitation rights which might have been awarded may be terminated when there is an action regarding "the parental rights with respect to such child or the adoption of such child."
[3] Unlike some trials where such limited intervention is granted, the court did not restrict the intervenors to presenting CT Page 15656 their evidence after the conclusion of the State's case, but permitted them to participate and cross-examine the state's witnesses where relevant to the dispositional issues before the court.